# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Case No. CR416-144 |
| | ) | |
| LARRY E. WILLIAMS | ) | |

## REPORT AND RECOMMENDATION

Indicted for possession of a controlled substance in violation of 21 U.S.C. § 844(a) and an assortment of gun-possession charges, doc. 1, Larry Eugene Williams moves to suppress the evidence against him. He contends that the police officer who seized and searched him on a city street violated his Fourth Amendment rights. Docs. 18 & 21.[1]

## I. GOVERNING STANDARDS

The law has structured the Fourth Amendment inquiry into tiers: "(1) police-citizen exchanges involving no coercion or detention; (2) brief

---

[1] At the evidentiary hearing on this motion the Court spent considerable time explaining to defense counsel why his motion and briefs failed to meet the standards set forth in S.D. Ga. Loc. Cr. R. 12.1. Doc. 27 at 3-12; *see also United States v. Williams*, 2016 WL 211817 * 1 (S.D. Ga. Jan. 14, 2016) ("As this Court explained in *United States v. Broadnax*, 2016 WL 102197 at * 1 (S.D. Ga. Jan. 8, 2016), an unacceptable amount of judicial and prosecution resources are consumed if suppression motions are reached that fail to comply with S.D. Ga. Loc. Cr. R. 12.1.")).

seizures or investigatory detentions; and (3) full-scale arrests." *United States v. Matchett*, 802 F.3d 1185, 1191 (11th Cir. 2015) (quoting *United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006)); *United States v. Cartwright*, 2016 WL 1595386 at * 3 (M.D. Ga. Apr. 20, 2016).

Tier one triggers no Fourth Amendment safeguards. *Utah v. Strieff*, ___ U.S. ___, 2016 WL 3369419 at * 7 (2016) ("Nothing prevented [the police officer] from approaching [the defendant] simply to ask" him about what was going on in a suspicious home from which he had just exited) (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions")). To determine consent courts consider

> whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching, and the language and tone of voice of the police.

*United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011) (quoting *Perez*, 443 F.3d at 778); *United States v. Villanueva*, 2016 WL 3344227 at * 3-4 (M.D. Fla. June 13, 2016). They consider whether the defendant's freedom of movement was restrained by physical force or by submission

to a show of authority. *Jordan*, 635 F.3d at 1186; *Villanueva*, 2016 WL 3344227 at * 4. If not, the inquiry ends.

The next tier is the investigative stop authorized by *Terry v. Ohio*, 392 U.S. 1 (1968). Here officers must have reasonable suspicion -- a "minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). That's "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Id.* It's "determined from the totality of the circumstances and from the collective knowledge of the officers involved in the stop." *United States v. Glinton*, 347 F. App'x 453, 454 (11th Cir. 2009) (quotes and cites omitted). Courts view "the totality of the circumstances in the light of the officer's special training and experience because behavior, seemingly innocuous to the ordinary citizen, may appear suspect to one familiar with [criminal] practices." *Matchett*, 802 F.3d at 1192 (quotes and cite omitted).[2]

---

[2] Inchoate and unparticularized suspicions or hunches of criminal activity won't satisfy the minimum level of objectivity required. *Cartwright*, 2016 WL 1595386 at * 3 (citing *United States v. Perkins*, 348 F.3d 965, 970 (11th Cir. 2003)). The court is to view the totality of the circumstances, not each fact in isolation. *Id.* (citing *United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002)).

3

The last tier is the formal arrest. The most intrusive seizure, it is reasonable only if supported by probable cause. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."); quoted in *Parton v. Dorning*, 2016 WL 354347 at * 12 (N.D. Ala. June 29, 2016).

"Situational behavior" can drive a police-citizen encounter from consensual to investigative to full arrest. *United States v. Scroggins*, 599 F.3d 433, 441 (5th Cir. 2010) ("If officers gain new information relevant to safety or criminal conduct, the scope of their permissible investigation may expand. For example, reasonable suspicion may 'ripen' or 'develop' into probable cause for an arrest if a *Terry* stop reveals further evidence of criminal conduct."), quoted in *United States v. Coleman*, 22 F. Supp. 3d 624, 629 (M.D. La. 2014); *see also id.* at 630 (police officers did not "seize" defendant in approaching him in convenience store parking lot; officers approached defendant and occupants of truck to speak about store's loitering policy and approach did not involve elements of detention or coercion); *id.* (officer had reasonable suspicion to detain

4

defendant in convenience store parking lot by drawing his stun gun; store was in high-crime area, it was late at night, and officer observed defendant handling a gun); *id.* (officer had probable cause to arrest the defendant, where he commanded him to raise his hands, the defendant attempted to flee, continued to flee after he was ordered to stop, and dropped a handgun after being hit by police stun gun).[3]

## II. BACKGROUND

Around 7:30 p.m. on September 28, 2015, Corporal Chester Balmer -- a fourteen-year police department veteran -- patrolled Pennsylvania Avenue in Savannah, Georgia. Doc. 27 at 13-14; doc. 21 at 5. Running a crime-suppression beat in an area saddled with "a lot of drugs . . . a lot of house break-ins, [and] a lot of car break-ins," *id.* at 14, he and a trainee drove past a convenience store when he noticed two black males standing behind a dumpster near the store's rear. *Id.* at 14-15. That aroused his

---

[3] Even if the seizure is ultimately determined to be illegal, that will not support application of the exclusionary rule if the individual was subject to an outstanding arrest warrant, even though the officer was unaware of that warrant at the time of the seizure. *Strieff*, 2016 WL 3369419 at * 8 ("The outstanding arrest warrant for Strieff's arrest is a critical intervening circumstance that is wholly independent of the illegal stop. The discovery of that warrant broke the causal chain between the unconstitutional stop and the discovery of evidence by compelling Officer Fackrell to arrest Strieff.").

5

suspicions because "most people don't just hang out behind the dumpster like that." *Id.* at 15.

Balmer nevertheless "gave them the benefit of the doubt, and [thus] circled a long block." Doc. 27 at 16. About "two or three minutes" later, he returned to see the two men "still standing in the same location." *Id.* What happened next forms the crux of the issue presented here:

> A. I actually pulled past them and pulled into the parking lot and started to exit my vehicle. I asked them, hey, can you come talk to me for a minute. One male ducked behind the fence and hid. Another male, later identified as Mr. Williams, turned and started walking straight towards me.

> \* \* \*

> A. Well, once he got close, I asked him if he had any identification. He told me no. At that point I noticed what looked like a clear bag hanging out of his right front pocket. I pointed to the bag, asked him what was the deal with the bag. He made a really quick motion to put his hand in his pocket and push the bag down.

> At that point I didn't know whether he was concealing something or going for a weapon. I took hold of that arm. I actually turned him around facing away from me. There was a parked car there, wasn't mine. And put him up to that car. At that point he pulled his hand out of his pocket and put something in his mouth. I could see something in his hand, but I couldn't tell what it was because it was a quick motion. Like a plastic bag. Because of his actions, I handcuffed him. I at that point asked him to spit out what he put in his mouth.

Q. At that point in time was the subject facing toward you or away from you, sir?

A. He was facing away from me at that point, but --

THE COURT: At which point?

THE WITNESS: When I asked him to spit out what he had in his mouth.

THE COURT: All right.

THE WITNESS: He kept chewing, and I turned him around, asked him again. He then opened his mouth and told me he wasn't chewing anything. I could see a small clear bag and what looked like white rocks in his mouth, I associate with crack cocaine.

Doc. 27 at 17-18; *see also id.* at 26 ("he pushed the plastic bag down.").

Balmer elaborated on the point of arrest:

I grabbed his arm and held him just in case he was going for a weapon, because I didn't -- that's for my safety and for his. I turned him around away from me so he couldn't see me, but he made the motion to pull his hand out and put something in his mouth, which I associated with the possibility of being drugs. Once he did that and then refused my order to spit it out, that's when I put him in handcuffs and he'd at least be charged for obstruction.

Doc. 27 at 27.

This testimony was unrebutted. The same must be said for Balmer's experiential testimony -- that he had been dealing with crack cocaine arrests for 14 years and was well familiar with the fact that plastic baggies were commonly used for packaging it. *Id.* at 18. Upon

7

Williams' refusal to cooperate (spit it out), Balmer concluded that he had probable cause to arrest Williams "at least for obstruction." *Id.* at 19. Upon his search of Williams incident to that arrest, he found a bank card with someone else's name on it, plus the ankle gun and drugs that are now the subject of this prosecution. *Id.* at 19-20. For good measure, Balmer took Williams to a nearby hospital "to check him out to make sure he didn't ingest too much that was going to harm himself," *id.* at 20, and while there -- and without any questioning or prompting by Balmer -- Williams "asked me how much time did he get for cocaine and then told me he didn't chew anything because it fell out in his pocket." *Id.* at 21.

## III. ANALYSIS

In his brief Williams contends that his "initial detention was without probable cause, that [Balmer's] approach to [him] was made without reasonable articulable suspicion that a crime was being or had been committed, and that [Williams'] statements were not made knowingly and voluntarily, as he had invoked his constitutional right to counsel. The discovery of the firearm and drugs, as well as [his] statements, are all therefore fruit of the poisonous tree." Doc. 18 at 2. At the hearing, defense counsel argued that "[i]t became unreasonable

when [Balmer] passed by [Williams] a second time, saw the exact same behavior, saw no violation of the law and called out to [the two males], hey, come speak to me. That's when it became unreasonable." Doc. 27 at 40. In other words, defendant insists that the first contact was a detention and that it was unreasonable.

This claim is just plain baseless. First, nothing about the officer's initial approach -- whether based on *any* level of suspicion or not -- violated the Constitution. Again, a consensual police-citizen encounter is *not* subject to Fourth Amendment scrutiny. *See Strief*, 2016 WL 3369419 at * 7; *Hiibel v. Sixth Judicial Dist. Court of Nev.*, 542 U.S. 177, 185 (2004) ("In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment."); *see also id* ("[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure.") (quotes and cite omitted); *Bostick*, 501 U.S. at 434 ("[M]ere police questioning does not constitute a seizure."). Williams voluntarily approached Balmer, who issued no command but simply *asked* if he could speak with the two men. The initial encounter did not involve a seizure, therefore. After Williams denied having any identification, Balmer

9

spotted the plastic baggie partially hanging out of Williams' front pants pocket. When the officer asked about the baggie, Williams immediately thrust his hand into that pocket. Only at that point did the officer -- who was naturally concerned for his safety in the face of such a maneuver -- take hold of Williams. Given the totality of the circumstances (two men loitering by a dumpster at the back of a store, one of whom attempts to hide from the officer when spoken to and the other who thrusts his hand into his pocket when the officer inquires about a baggie hanging out it), this experienced officer not only reasonably suspected that some type of criminal activity was afoot but also that Williams posed a potential threat to his safety. Williams' subsequent effort to obstruct the officer's legitimate investigative seizure by swallowing the evidence elevated the officer's suspicions to the level of probable cause for arrest. The unrebutted facts furnish no basis for the suppression of the evidence acquired during Williams' lawful seizure and arrest.

There is *no* evidence (Williams never testified) that Williams invoked his right to counsel, much less involuntarily spoke to Balmer, during *any* phase of their encounter. Williams, therefore, has shown no ground for the suppression of his statements.

## IV. CONCLUSION

Larry Eugene Williams' motion to suppress (doc. 18) is utterly without merit and therefore should be **DENIED**.

**SO REPORTED AND RECOMMENDED** this  6th  day of July, 2016.

*[signature]*
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA